**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-123 (RDM)** |
| **v.** | : | |
| | : | |
| **JEFFREY L. MUNGER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Jeffrey L. Munger to three years of probation, to include four months of home detention, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Jeffrey L. Munger, a 55-year-old man from Goshen, Indiana, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

Defendant Munger pleaded guilty to one count of violating 40 U.S.C.  § 5104(e)(2)(G). As explained herein, a sentence of home detention is appropriate in this case because Munger entered

---

[1] Although the Statement of Offense in this matter, filed on May 20, 2022, (ECF No. 17 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of April 5, 2022, the most current estimate of the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

the Capitol building through a broken window after he heard glass breaking and watched people try to force open doors. He clearly knew that his entry into the building was prohibited. Once inside, he took photographs and walked down a hallway, remaining inside for approximately 14 minutes before exiting the building through the Senate Wing Door that was next to the broken window through which he had entered. Twice interviewed by the FBI, Munger twice gave false (and inconsistent) explanations for why he entered the Capitol. Although he has accepted responsibility for his actions, even now, in his written statement to the United States Probation Office, Munger minimizes the seriousness of his conduct.

The Court must also consider that Munger's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts and circumstances of Munger's crime support a sentence of three years' probation, to include four months' home detention, 60 hours of community service, and $500 in restitution in this case.

2

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 17 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Munger's conduct and behavior on January 6.

*Defendant Munger's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Munger traveled to Washington, D.C., from his home in Indiana to attend the "Stop the Steal" rally. During a voluntary, non-custodial interview with the FBI in December 2021, he stated that he had posted on Facebook before January 6, 2021, asking if anyone wanted to go to the rally with him.  Several of his relatives indicated that they did, and Munger met with them in Washington, D.C.  After attending the former President's rally together with members of his family, Munger separated from them to join the crowd headed to the Capitol building.  He arrived at the West Lawn of the Capitol, after having observed barriers on the sides of walking paths, and understanding that the barriers had been in place to keep people from entering the Capitol grounds.  Once at the Capitol, he saw rioters and heard them yelling and chanting, "Our house!"  He also saw rioters trying to force open doors to the Capitol and he heard glass breaking.   Munger took videos and photos of rioters in the scaffolding, and rioters chanting "Our house," while at a Senate Wing window. [2]

---

[2]  Although Munger has a Facebook account and a Twitter account, PSR ¶ 35, to the government's knowledge, Munger did not post his photos and videos on social media. He later voluntarily provided the photos and videos to the FBI.

Munger entered the Capitol by climbing through a broken window next to the Senate Wing door at approximately 2:50 p.m.  He was wearing a brown, hooded jacket over a light gray baseball cap with an American flag, a black face mask, and glasses.  Although rioters had initially broken this window and breached this entire area 25 minutes earlier, U.S. Capitol Police had succeeded in re-establishing a secure perimeter at these two windows and door shortly before Munger and other rioters arrived outside the door at around 2:47 p.m.  The rioters in front of Munger pushed past those police officers, and successfully breached this area a second time, allowing Munger to enter through the broken window.  *See* CCTV Video from Senate Wing Door, submitted as Exhibit 1.

The door and windows were guarded by police at 2:47 p.m.:



IMAGE 1

By 2:50 p.m., rioters in front of Munger had pushed through the police stationed there, and Munger was able to enter.



IMAGE 2

Once through the broken-out window frame, Munger paused before stepping down to the

floor, took out his phone, and took multiple photos of the interior of the building.



IMAGE 3

Once Munger stepped down from the window area, he took off his hood, revealing his light-gray baseball cap with an American flag. Munger lingered next to the window for over nine minutes.



IMAGE 4

After that, Munger headed to his right, down a hallway, but returned a few minutes later. He then exited the building through the Senate Wing Door next to the window through which he had climbed. Munger remained inside the building for approximately 14 minutes.

*Munger's Pre- and Post-arrest Interviews with the FBI*

Munger gave a voluntary, non-custodial interview to the FBI on December 15, 2021 at his home. During this interview, he admitted to traveling to Washington, D.C. and attending the rally with family members on January 6, 2021. He made notations on a map of Washington, indicating where he was at the rally and the direction in which he walked (toward the Capitol) after the rally.

Munger admitted that he approached the Capitol, heard people chanting "Our house," saw rioters force open doors, and heard glass breaking. He also heard some rioters telling others to stop. Munger admitted that he had entered the Capitol through a window, but falsely stated that he had done so because the crowd behind him was pushing him and the only way for him to leave the area was to go through the window and exit through the Senate Wing door. (Munger's statement is at odds with his actual conduct in entering the building, as shown in the USCP surveillance video footage in Exhibit 1.)

Munger further stated that after he climbed through the window, the crowd pushed him against the wall, where he stayed for a few minutes. After that, he went down a hallway to see what was happening there. Munger said he saw people smoking pot, and then decided to leave the building. He drew a freehand drawing for the agents of the path that he took once inside the Capitol.

Munger admitted that he took a few photos in the building, and "selfies" outside of the building. He sent these photos to the FBI agent and identified himself in other photos shown to him by the agent. He also identified the clothes he was wearing in the photos and stated that he still possessed the hat and jacket he was wearing in the photos. Munger allowed agents to photograph these items.

On March 23, 2022, FBI agents arrested Munger at his home. He waived his *Miranda* rights and again voluntarily spoke with the agents. Munger guided agents to the items of clothing he had worn on January 6, and acknowledged that he knew he was not allowed inside the Capitol that day. However, once again Munger offered a false reason for entering the Capitol, this time stating that he decided to go into the building to stand between a female police officer and the crowd that he believed might attack her. He stated that he had looked through the window before

entering and saw that the female police officer appeared to be "panicking." (Once again, Munger's statement is belied by the video in Exhibit 1].)

*The Charges and Plea Agreement*

On March 15, 2022, the United States charged Munger by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G). On March 23, 2022, law enforcement officers arrested him at his home in Indiana. On May 20, 2022, pursuant to a plea agreement, Munger pleaded guilty to a one-count Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Munger agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Munger now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Munger faces up to six months of imprisonment and a fine of up to $5,000. Munger must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of four months' home detention.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.   Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing Munger's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Munger personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Munger is therefore not a mitigating factor in misdemeanor cases.

Munger entered the building just minutes after rioters overcame the police line standing guard at the windows and doors. The window he climbed through had had the glass smashed out, and as he acknowledged, he fully understood he was not supposed to be there. Once inside, Munger lingered at the window and then wandered down a hallway. Munger's conduct undoubtedly contributed to the success of the overall effort to breach the Capitol by adding to the momentum of the mob that vastly outnumbered law enforcement officers who were trying to protect the vice president, members of Congress, and the Capitol itself.

His conduct underscores the need for an appropriate sentence of four months' home detention, as well as a term of probation and community service.

### B.  The History and Characteristics of Munger

Munger is a 55-year-old Indiana man with a limited criminal history that consists of a 1997 conviction for driving while impaired. Additionally, the PSR notes that according to commercial government tracking services, Munger had a 1991 arrest for driving while impaired, and PSADC automated records show a 1991 arrest for simple assault; however, no disposition is noted for either offense. PSR ¶¶ 23, 28. The PSR reports that he has been unemployed since 2010 due to medical conditions. PSR ¶ 47. Prior to that, he was a construction worker. He has been married since 2013, and a resident of Goshen, Indiana since 2005.

While Munger has accepted responsibility for his actions, he twice gave false reasons to the FBI for his entry, initially claiming that other rioters pushed him forward and the only way to leave was to go through the window so that he could turn around and exit through the door, and

later claiming that he entered to protect a panicky female police officer. Even now, in his written statement to the United States Probation Office, he minimizes the seriousness of the crime: Munger stated that he was just following the crowd and "When I got to the base of the Capitol … the crowd was just meandering up, so I just followed along …. A window and door had been broke and I could see the police standing inside the window.  I made the stupid mistake of going inside  and basically did what the police were doing, which was observing what was going on." *Id*. ¶18.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

      *General Deterrence*

      The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

      General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by this Court during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

      The gravity of these offenses demands deterrence. This was not a protest.  *Id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—

that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Munger's words and actions indicate some acceptance of responsibility and remorse but he also twice gave FBI agents a false reason for his decision to enter the Capitol on January 6, 2021, and even now minimizes his conduct, in his statement to the Probation Office, as merely following the crowd and making "the stupid mistake of going inside and basically [doing] what the police were doing, which was observing what was going on."   A sentence of home detention is warranted to deter Munger from engaging in similar unlawful conduct in the future..

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Munger based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Munger convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[5]  *See United States v. Anna*

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Munger has pleaded guilty to a single-count Information, charging him with parading, picketing, and demonstrating, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor, and therefore the U.S. Sentencing Guidelines do not apply.  18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103,

---

disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Paul Colbath*, the defendant spent approximately five to six minutes inside the Capitol, exited of his own accord, was not involved with any violence or property destruction, and had no criminal history. Upon arrest, the defendant voluntarily spoke with agents, was forthcoming about his conduct, and showed remorse. But the defendant personally witnessed some of the chaos of the breach, as he acknowledged to the FBI and in texts to his wife, stating that he saw "clear signs of destruction" and "tear gas." The government requested a sentence of 36 months' probation, to include three months' home detention, 60 hours of community service, and $500 in restitution. This Court sentenced Colbath to 36 months of probation, to include 30 days' home detention, 60 hours of community service, and $500 in restitution. *See United States v. Colbath*, Case No. 1:21-cr-650-RDM.

Similarly, in *United States v. Torrens*, the defendant spent about 10 minutes inside the Capitol, exited of his own accord, was not involved with any violence or property destruction, and had no criminal history. Upon arrest, the defendant voluntarily spoke with agents, was

forthcoming about his conduct, and showed remorse.  The government requested a sentence of two weeks incarceration and $500 in restitution.  The court sentenced Torrens to 36 months of probation to include three months of home detention as well as $500 in restitution.  *See United States v. Torrens*, Case No. 1:21-CR-204-2-BAH.

In another comparable case, *United States v. Reimler,* the defendant spent about 19 minutes inside the Capitol and exited of his own accord.  Like Munger, Reimler voluntarily spoke to FBI agents and admitted his presence in the building, acknowledging that he had seen metal barricades that had been pushed aside or knocked down.  The government requested a sentence of 36 months of probation to include two months of home detention.  This Court sentenced Reimler to 36 months of probation to include 30 days of home detention, as well as 60 hours of community service and $500 in restitution.  *See United States v. Reimler*, Case No. 1:21-CR-239-RDM.

Finally, in *United States v. Fitchett*, the defendant spent about 10 to 15 minutes inside the Capitol building with her friend, Douglas Sweet.  They were both arrested by law enforcement officers in the Capitol Visitor Center corridor after rioters refused officers' commands to exit the building.  Like Munger, Fitchett cooperated with law enforcement following her arrest, gave a voluntary interview with the FBI, and voluntarily provided evidence to the FBI.  The government requested a sentence of 36 months of probation, to include two months of home detention. The Court sentenced the defendant to 36 months of probation, to include 30 days of home detention, as well as 60 hours of community service and $500 in restitution.  *See United States v. Fitchett*, Case No. 1:21-CR-41-CJN.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d

16

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to three years of probation, to include four months of home detention, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     _____/s/_____
Cindy J. Cho
Assistant United States Attorney
Member of NY Bar
601 D Street, N.W.
Washington, D.C. 20530
(317) 246-0107
Cindy.Cho@usdoj.gov

17

## <u>CERTIFICATE OF SERVICE</u>

On October 7, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

_____/s/_____

Cindy J. Cho
Assistant United States Attorney
Member of NY Bar
601 D Street, N.W.
Washington, D.C. 20530
(317) 246-0107
Cindy.Cho@usdoj.gov